UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VERNARD A. JONES, SR. and
MAR'TINA JONES,
Co-Personal Representatives
of Estate of Vernard A. Jones, Jr.,

        Plaintiffs,                        Case No. 1:07-cv-388

v.                                        HON. JANET T. NEFF

MUSKEGON COUNTY, et al.,

        Defendants.

_____/


## OPINION

This civil rights action[1] arises out of the May 5, 2005 death of twenty-two-year-old Vernard A. Jones, Jr. ("Jones") while he was in pretrial custody at the Muskegon County Jail, less than a month after he was diagnosed with colorectal cancer. Plaintiffs' First Amended Complaint alleges three claims against the county and numerous jail personnel: Count 1—Violation of Civil Rights, 42 U.S.C. § 1983; Count 2—Gross Negligence, Intentional, Wilfull, Wanton Misconduct; and Count 3—Intentional Infliction of Emotional Distress. Pending before the Court are three separate motions for summary judgment filed by defendants (1) Muskegon County ("County") and twenty-two individual corrections officers[2] ("Officers"); (2) the jail nurses Nancy Mastee, Sherry Malenko

_____

[1] On August 10, 2007, this case was reassigned to the undersigned pursuant to administrative order No. 07-091.

[2] One corrections officer, defendant Marna O'Grady, has been dismissed from this action pursuant to the parties' stipulation (Or., Dkt 167).

and William Yonker ("Nurses"); and (3) the jail doctor, David Deitrick, M.D.[3]  Also before the

Court are various motions to strike certain evidentiary support submitted with the pending motions

for summary judgment.  After consideration of the motions to strike, the Court grants the motions

for summary judgment for the reasons fully explained herein.[4]

## I.  UNCONTROVERTED MATERIAL FACTS[5]

On September 24, 2004, Jones was arrested and incarcerated in the Muskegon County Jail

on a charge of second-degree murder (Co./Pl. SMF ¶ 1).  On the inmate intake form, Jones indicated

that he had a sexually transmitted disease, but otherwise reported no health problems or abdominal

pain (*id.* ¶ 2).  A little over a month later, on October 31, 2004, Jones participated in the completion

of a health survey form, in which he likewise denied frequent indigestion and stomach trouble or

ulcer (*id.* ¶ 3).

At the time of booking, Jones' self-reported weight was 170 lbs and his height was 5' 11"

(Co./Pl. SMF ¶ 3).  When his criminal defense counsel, Robert German, first met with him in

January or February of 2005, Jones looked like a normal young man, and counsel noted nothing

remarkable about Jones' physical appearance (*id.* ¶¶ 4-5).  However, within the next few months,

Jones experienced significant weight loss and began to have serious gastro-intestinal problems.  By

late March or April of 2005, Jones complained to his defense attorney that he was "not feeling well"

(*id.* ¶¶ 4-5).  On March 25, 2005, Officer Warner Watson noticed that Jones did not eat his food (*id.*

---

[3] Dr. Deitrick has also joined in the County's motion for summary judgment.

[4] Having reviewed the parties' written submissions and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process.  *See* W.D. Mich. LCivR 7.2(d).

[5] These material facts are drawn from the parties' respective statements of material facts (SMF) in their motion briefs.

¶ 6).  Officer Watson informed the jail medical department of Jones' complaint that he could not "keep [his] food down" (*id.* ¶ 6).  On March 26, 2005, Officer Sherry Wright became aware that Jones needed medical care; she contacted the jail nurse, requested that Jones be assessed, and escorted him to the medical department (*id.* ¶ 7).

During Jones' detention, the medical clinic at the jail was staffed by two full-time registered nurses, William Yonker and Sherry Malenko, and one part-time nurse, Nancy Mastee (Nurses/Pl. SMF ¶ 4).  The nurses work out of a small clinic on the ground floor of the jail between the booking/holding cells and the public entrance to the jail (*id.* at 5).  The corrections officers distribute medical request forms ("kites") for the detainees to request a medical visit to the clinic (*id.*)  The guards then collect the kites and deliver them to the clinic, and the clinic calls for the detainee to be brought to the clinic for consultation and examination (*id.*).

On March 29, 2005, Dr. Deitrick examined Jones because of his stomach complaints; Dr. Deitrick gave him medication (Nurses/Pl. SMF ¶ 10).  From April 4 through April 8, 2005, Jones was seen by jail medical personnel for a continued complaint of stomach pains (*id.*).

Attorney German testified in his deposition that prior to April 6, 2005, he met with Jones four to five times at the jail (Nurses/Pl. SMF ¶ 6).  He first met with Jones in January or February 5, 2005, and he did not recall Jones complaining of any abdominal pain at that time; Jones looked like a normal young man (*id.*).  German did not recall Jones complaining of any abdominal pain in any of those visits (*id.* at ¶ 7).  However, around the end of March and the beginning of April 2005, Jones complained to German that he was "not feeling well" (*id.*).  Asked whether he recalled how Jones looked physically, German stated, "It was unremarkable at that time, it was nothing I noted"

(*id.*).  Sometime beginning April 3, 4 or 5, 2005, German requested medical attention for Jones (*id.*; Co./Pl. SMF ¶ 5).

On April 8, 2005, Jones was transported to Hackley Hospital in Muskegon and on April 9, 2005, he underwent surgery for cancer (Co./Pl. SMF ¶ 9).  Jones was released from the hospital on April 20, 2005 and sent back to the jail where he died on May 5, 2005 (*id.* ¶ 10).

## II.  SUMMARY JUDGMENT STANDARD

### A.  Legal Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In considering a motion for summary judgment, the Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party.  *Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009).  The court may not, however, make credibility determinations, weigh the evidence or determine the truth of the matter asserted, since such functions rest solely with the ultimate factfinder.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Weaver v. Shadoan,* 340 F.3d 398, 405 (6th Cir. 2003).

The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Harrison v. Ash,* 539 F.3d 510, 516 (6th Cir. 2008).  The nonmoving party must then present sufficient evidence from which a jury could reasonably find in its favor.  *Anderson,* 477 U.S. at 252, 256-57; *Harrison,* 539 F.3d at 516.  The court must ultimately "determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

*Harrison,* 539 F.3d at 516 (quoting *Anderson,* 477 U.S. at 251-52). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

"[T]he issue of 'whether [defendants] were deliberately indifferent is a mixed issue of law and fact ….'" *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Williams v. Mehra,* 186 F.3d 685, 690 (6th Cir. 1999) (en banc)). The resolution of this issue requires a comparison of defendants' conduct with the legal standard of deliberate indifference. *Id.*

### B. Motions to Strike

The parties have filed various motions to strike evidence submitted with the opposing parties' motion briefs. Defendants Mastee, Malenko and Yonker move to strike portions of inmate affidavits submitted by plaintiffs (Dkt 162), essentially on the grounds that certain averments are inadmissible hearsay, otherwise inadmissible or incredulous. Defendants Muskegon County and the Officers move for joinder in co-defendants' Mastee, Malenko and Yonker's motion to strike portions of the affidavits (Dkt 164). Plaintiffs in turn move to strike Exhibit 3 of the reply brief of Muskegon County and the Officers, which are transcripts of numerous jail telephone calls or visits with Jones from December 21, 2004 through March 2005 (Dkt 172).

The Court has considered the various motions to strike and the parties' arguments. Upon review, the Court finds it unnecessary to strike the contested evidentiary support. The Court has given due consideration to the parties' evidentiary objections in evaluating the evidence in support of and in opposition to the substantive motions.

### III. VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

This case involves the unexpected death of a twenty-two-year-old detainee in a county jail following his arrest for second-degree murder and a diagnosis of cancer.[6] The Court recognizes the difficult and unfortunate circumstances of this young man's death in a facility ill equipped to provide the level and type of care required for a terminal cancer patient. And while plaintiffs rely heavily on these generalities in seeking recompense,[7] after careful consideration, the Court concludes that plaintiffs' case for legal recourse is unsupported by the evidence and the applicable legal standards.

### A. Analytical Framework

Plaintiffs allege claims against all twenty-six defendants under 42 U.S.C. § 1983. "'To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Dominguez,* 555 F.3d at 549 (citations omitted). However, "[u]nder the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

---

[6] According to the Discharge Summary, Jones' primary diagnosis was: carcinomatosis, probable colorectal cancer; deep venous thrombosis with pulmonary embolism; profound malnourishment; anemia; and leukocytopenia (Pl. Resp. to Co. Ex. 20).

[7] Plaintiffs "sweep a broad brush" in arguing that legal liability is warranted against the County and anyone associated with Jones' detention and medical care at the jail. In doing so, plaintiffs fail to provide the Court with a reasoned analysis of legal liability based on the actual evidence in this case and the applicable legal principles. Such argument falls far short of the careful logic and constitutional standards required to establish individual culpability for deliberate indifference to the medical needs of a detainee. Aside from making the analysis of claims more difficult, this generalized approach unnecessarily consumes limited Court time and resources.

person would have known.'" *Id.* Thus, a two-part inquiry is used to determine whether qualified immunity applies in a particular case: "'First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?'" *Id.* (citations omitted).

### 1. *Constitutional Violation*

In the context of this case, plaintiffs allege constitutional violations with regard to Jones' medical care while in custody. "The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore,* 390 F.3d at 895 (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). "Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment." *Id.* (citing *Bell v. Wolfish,* 441 U.S. 520, 545 (1979)). "Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983." *Id.* "Prison officials' deliberate indifference violates these rights '[w]hen the indifference is manifested by ... prison guards in intentionally denying or delaying access to medical care ...' for a serious medical need." *Id.* (quoting *Estelle,* 429 U.S. at 104).

"A constitutional claim for denial of medical care has objective and subjective components." *Blackmore,* 390 F.3d at 895. "The objective component requires the existence of a 'sufficiently serious' medical need." *Id.* (citations omitted). "As the Supreme Court explained in *Farmer* [*v. Brennen,* 511 U.S. 825, 834 (1994)], 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Id.* (citation omitted).

"The subjective component requires an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Blackmore,* 390 F.3d at 895 (citations omitted). "This subjective component 'should be determined in light of the prison authorities' current attitudes and conduct.'" *Id.* (quoting *Helling v. McKinney,* 509 U.S. 25, 36 (1993)). "Deliberate indifference 'entails something more than mere negligence,' but can be 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* at 895-96 (citations omitted). "Under *Farmer,* 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 896 (citations omitted). "'Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.'" *Id.* (quoting *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir. 1994)).

## 2. *Clearly Established Right*

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Dominguez,* 555 F.3d at 552. That is, the unlawfulness must be apparent in light of preexisting law. *Anderson,* 483 U.S. at 640.

## B. Analysis

In this case, defendants either admit or presume for purposes of the motions, that Jones' medical needs were serious, thus satisfying the objective component of a constitutional violation. The remaining question is whether plaintiffs have satisfied the subjective component.

The parties vigorously dispute the timing and import of Jones' symptomatology in assessing whether the remaining twenty-six named defendants can be shown to have had a sufficiently culpable state of mind in denying medical care. *See Blackmore,* 390 F.3d at 895-96. The liability of the various defendants is considered as presented in the separate motions.

### 1. Individual Defendants

The dispositive question with respect to the individual defendants is whether each particular individual had a sufficiently culpable state of mind in denying Jones medical care to be held accountable. *See Blackmore,* 390 F.3d at 895.

### a. *Defendant Corrections Officers*

Plaintiffs allege claims of deliberate indifference against twenty-one corrections officers on the basis that the officers worked on the second floor of the jail, which was the area where Jones' security cell was located. Plaintiffs assert generally that from "late 2004, [Jones] was complaining of abdominal pain, writing medical kites, requesting medical care, not eating his meals, and the guards were discussing it among themselves" (Pl. Resp. to Co. 23). Plaintiffs submit as evidence a Daily Staff Work Station list of the officers assigned to work as second floor guards and as second floor floats from February to May of 2005 (Pl. Resp. to Co. Ex. 32). Plaintiffs also submit a chart listing the days each of the twenty-two officers worked[8] (Pl. Resp. to Co. Ex. 33). Plaintiffs' claims of culpability are premised on the following:

---

[8] No work dates are listed for Officer Laura Lewis.

These are the guards who would have received Jones' complaints, his requests for medical care, and would have witnessed his failure to eat his meals. They would also have witnessed his weight loss. Despite this, none of them made any efforts to obtain medical care for him over the course of five months, until he was finally brought to the medical clinic on March 26.

(Pl. Resp. 22)

These generalized, blanket allegations are insufficient to establish the subjective component of a constitutional claim for denial of medical care, i.e., a sufficiently culpable state of mind with respect to the individual officers. *See Blackmore,* 390 F.3d at 895. The allegations do not permit a finding that any particular officer engaged in conduct that constituted deliberate indifference to Jones' medical needs as opposed to mere negligence. *See id.*

Plaintiffs further rely on the affidavits of four former inmates[9] to establish culpability of the corrections officers. Plaintiffs assert that these affidavits establish that Jones was complaining of abdominal pain to the guards, was writing written requests for medical care, and was not eating his meals (Pl. Resp. to Co. 22).

While the Court does not find the averments in these affidavits so devoid of merit or inadmissible that they should be discounted in their entirety, they are nevertheless lacking in specificity as to time, context and conduct such that they provide no basis for finding that particular officers, or the officers generally, had sufficiently culpable minds in denying Jones medical care. To be held liable, the officer must be "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Blackmore,* 390

_____

[9] Zakee Jerome Lawson (Pl. Resp. to Co. Ex. 8), Maurice Poole (Pl. Resp. to Co. Ex. 10), Diana Yager (Pl. Resp. to Co. Ex. 11) and Lawrence Dowdell (Pl. Resp. to Co. Ex. 19).

F.3d at 896 (citations omitted). The averments in the inmate affidavits do not permit such conclusions to be drawn with respect to any particular officer.

It is also noteworthy that the record submitted by plaintiffs is contradictory with regard to assessing liability against the corrections officers generally. For example, although plaintiffs cite the inmate affidavits in support of the officers' indifference and failure to respond to Jones' needs, an April 15, 2005 letter from attorney German to Dr. Veronica Petty, Jones' attending physician at Hackley Hospital, recounts that Jones had "lost 80 pounds over the past 3 months" and states that "[t]he deputies charged with his treatment advised the medical staff at the jail that he was not eating" (Pl. Resp. to Co. Ex. 21). Evidence that the officers advised the jail medical staff that Jones was not eating undermines any claim that the officers acted in deliberate indifference to Jones' medical needs.

This case raises serious questions about the system of medical care for inmates at the Muskegon County Jail. On the record before the court, however, absent some more specific connection between the alleged conduct and a culpable state of mind of any individual correction officer, the threshold showing for liability is not met, and summary judgment is properly granted in favor of the officer defendants.

b. *Defendant Jail Nurses*

Plaintiffs allege deliberate indifference against the three jail nurses who worked during Jones' incarceration, Yonker, Mastee, and Malenko. Defendant Nurses argue that they are entitled to summary judgment because plaintiffs cannot establish either the objective or subjective

component of a deliberate indifference claim with respect to the nurses.[10]  First, defendant Nurses assert that there is no evidence that any of the three nurses was aware that Jones had a serious medical condition until he was seen at the clinic on March 26, 2005 (Nurses Br. 9-10).  Defendants contend that without knowledge, it is impossible for any of the nurses to have been deliberately indifferent to Jones' medical needs.

Second, with regard to the subjective component, defendants assert that there is no evidence the nurses knew Jones was seriously ill until March 26, 2005, and from that time until April 8, 2009, Jones was being examined, tested, and referred to the jail doctor, who then referred him to Hackley Hospital for more extensive tests (Nurses Br. 10).  They further argue that after the diagnosis of cancer and Jones' surgery, the nurses had no role in deciding that he would be returned to the jail for his hospice care (*id.* at 11).  Thus, since the subjective component must be addressed for each nurse individually, plaintiffs cannot show that any one of the nurses refused to provide care or treatment due a culpable state of mind.

Plaintiffs premise defendant Nurses' liability on allegations that the nurses ignored medical kites from Jones as well as requests for medical attention from Jones and his father, Vernon Jones, Sr.  Plaintiffs rely in large part on the affidavits of the other inmates, which as noted above with respect to the corrections officers, generally aver that Jones' medical kites were ignored, and that jail personnel did not respond to his requests or need for medical care.

---

[10] Defendant Nurses admit Jones developed serious medical conditions while he was in the jail, but nevertheless state that plaintiffs cannot meet the objective component of the deliberate indifference claim (Nurses Br. 9-10).  Despite their statement, defendant Nurses' arguments focus only on the subjective component.

As with the corrections officers, the generalized averments in the inmate affidavits are insufficient to establish the requisite culpable state of mind with respect to any particular nurse or the nurses in general. On the one hand, plaintiffs allege that the corrections officers are liable because they failed to deliver Jones' medical kites to the medical staff, and on the other hand, plaintiffs allege that the nurses are liable because they failed to act on the medical kites. These contradictory allegations render legal attribution of a culpable state of mind impossible, since the theories are mutually exclusive. To the extent that plaintiffs would allege culpable conduct in each regard, i.e., that some medical kites were not delivered to the medical staff, and also that the nurses did not respond to the requests or kites that were delivered, such allegations are stretched so thin over time and the number of defendants that they do not support a conclusion of deliberate indifference. Even "in cases where prison officials 'actually knew of a substantial risk to inmate health or safety [, they] may be found free from liability if they reasonably respond to the risk, even if the harm ultimately was not averted.'" *Harrison,* 539 F.3d at 519 (quoting *Farmer,* 511 U.S. at 844).

There is no evidence that the nurses were aware of Jones' abdominal pain and weight loss until March 26, 2005. The undisputed medical records show that once Jones was referred to the medical clinic on March 25, 2005, he was examined, medical tests were ordered, and he was referred to Dr. Deitrick for further evaluation (Nurses Br. Ex 11; Pl. Resp. to Nurses Ex. 5). Jones was again seen in the medical clinic on March 29, 2005 (*id.*). Over the course of the next week, progressive treatment was undertaken by the jail medical staff, with further evaluation and testing of Jones ordered (*id.*). On April 8, 2005, Jones was again brought to the medical clinic and transported to Hackley Hospital's emergency room for evaluation (*id.*).

It is undisputed that upon arrival at Hackley Hospital, Jones was in dire condition, suggesting that his disease was already well advanced. The emergency physician's examination reported Jones as "extremely ill appearing 22-year-old male, extremely 'Ketek take'[sic, cachectic[11]] and clinically dehydrated … " (Pl. Resp. to Nurses Ex. 21). The medical reports from four doctors who examined Jones on April 9 and 10, 2005 describe Jones variously as "emaciated," "extremely emaciated," cachetic, and "absolutely cachectic" (*id.* Exs. 15, 16, 17, 18). However, these reports do not require a conclusion that his condition equates to liability for deliberate indifference. The reports contain inconsistent statements of Jones' recent weight loss, which is indicated as "a 30-pound weight loss over the past few months," "Patient describes a 30 to 40 pounds weight loss over the last two months," "60 pounds over the last several months, "nearly 60 pounds over the past six months" and "generalized abdominal pain of a month duration accompanied by weight loss of 50 pounds" (*id.* Exs. 15, 16, 17, 18, 21).

While these reports generally raise serious questions about the lack of recognition on the part of jail medical staff as to Jones' acute medical condition, they do not add evidence of subjective knowledge on the part of the nurses, so as to support liability for deliberate indifference. "'[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Miller v. Calhoun County,* 408 F.3d 803, 813 (6th Cir. 2005) (quoting *Farmer,* 511 U.S. at 838).

---

[11] The term "cachectic" (commonly misspelled as "cachetic") is defined as: "Having cachexia, physical wasting with loss of weight and muscle mass due to disease. Patients with advanced cancer, AIDS, and some other major chronic progressive diseases may appear cachectic." *See* http://www.medterms.com/script/main/art.asp?articlekey=40464.

Further, the medical reports state various histories/duration of Jones' abdominal pain. One stated that Jones was "having abdominal pain for some time, who presented tonight with much worse abdominal pain," and that "the pain has gotten much worse over the last several days" (Pl. Resp. to Nurses Ex. 16). Another stated: "He presented with abdominal pain, nausea, and vomiting which is worse over the past one month. He has been having abdominal pain for the past many weeks" (*id.* at 17). Another stated: "He was admitted on 04/08/05 with nausea and vomiting and generalized abdominal pain of a month duration … " (*id.* at 18). The emergency room report stated Jones' history as "Patient has been experiencing abdominal pain intermittently for months but pain has become nearly continuous over the last several days" (*id.* at 21).

There is scant evidence of Jones' complaints of pain before March 26, 2005. The date of the onset of Jones' serious medical condition is not clear from the record. However, even Jones' own defense counsel, attorney German, testified that during his four or five face-to-face meetings with Jones between January or February 2005 and the end of March 2005, that Jones did not complain to him of abdominal pain (Nurses Br. Ex. 7 at 14-15, 22-25). It was around the end of March or beginning of April 2005 that Jones told German he was not feeling well (*id.* at 23).

What *is* clear from the record is that the severity of Jones' pain and medical condition increased dramatically in a very short period of time. The record shows that after March 26, the nurses attended to Jones' medical needs. Whether the care was inadequate or even negligent is not before the Court. "[T]he term deliberate indifference 'describes a state of mind more blameworthy than negligence.'" *Harrison,* 539 F.3d at 518 (quoting *Farmer,* 511 U.S. at 835). "Indeed, '[m]edical malpractice does not become a constitutional violation merely because the victim is a

prisoner.'" *Id.* (quoting *Estelle,* 429 U.S. at 105). On this record, the evidence is far too one-sided to create a jury-submissible issue of deliberate indifference against the Nurses.

Defendant Nurses are entitled to summary judgment.

### c. *Defendant Jail Doctor, Dr. Deitrick*

Defendant doctor, Dr. David Deitrick, moves for summary judgment of plaintiffs' deliberate indifference claim against him.[12] Plaintiffs allege that Dr. Deitrick was deliberately indifferent to Jones' medical needs during two periods: from March 29, 2005, when he first treated Jones, until April 8, 2005, when Jones was transferred to Hackley Hospital, and from April 20, 2005 until May 4, 2005 when Jones was returned to the jail after his surgery (Pl. Resp. to Dr. Br., SMF ¶ 2). Plaintiffs claim that during the first period, Dr. Deitrick treated Jones for constipation, when it was obvious his condition was more severe (*id.*). Further, Dr. Deitrick did not hospitalize or treat Jones on April 5 despite the fact that he clearly would have been cachectic and emaciated (*id.*).

As to the first period of treatment, the Court finds no basis for a claim of deliberate indifference. It is undisputed that Dr. Dietrick attended to Jones on his weekly medical rounds at the jail after he was brought to the clinic on March 25, 2006. As discussed above with respect to defendant Nurses, that Dr. Deitrick's assessment of Jones' medical condition was inadequate or incorrect is insufficient to establish a constitutional claim of deliberate indifference. "'[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Miller,* 408 F.3d at 813 (quoting *Farmer,* 511 U.S. at 838). "Indeed, '[m]edical malpractice does

---

[12] The parties stipulated to the dismissal of Counts 2 and 3 as to Dr. Deitrick only; thus, Count 1, violation of § 1983, is the sole remaining count against Dr. Deitrick (Dkt 109).

not become a constitutional violation merely because the victim is a prisoner.'" *Harrison,* 539 F.3d

at 518 (quoting *Estelle,* 429 U.S. at 105). Dr. Deitrick evaluated Jones and ordered medical tests.

> Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law. *See* e.g., *Pinon v. Wisconsin,* 368 F.Supp. 608 (E.D. Wis. 1973). *But cf. Fitzke v. Shappell,* supra at 1076-77 n.7. Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all. *See Tolbert v. Eyman,* 434 F.2d 625, 626 (9th Cir. 1970).

*Westlake v. Lucas,* 537 F.2d 857, 860 n.5 (6th Cir. 1976).

In this case, the record does not establish that Dr. Deitrick's medical treatment of Jones was

so "woefully inadequate" as to amount to no treatment at all. *Id.* Dr. Deitrick first examined Jones

on March 29, 2005 (Def. Dr. Br. Ex. 1). He diagnosed Jones with suspected bowel obstruction and

prescribed treatment and medication (Def. Dr. Br. 2; Pl. Resp. 1). He continued treatment at his next

weekly round on April 5, 2005 and upon reevaluation, he scheduled Jones for a CT scan of his

abdomen and for further testing at Hackley Hospital on April 6, 2005 (Def. Dr. Br. Ex. 1; Pl. Resp.

2). After he was taken to the hospital on April 8, 2005, Jones was diagnosed with probable

colorectal cancer (Def. Dr. Br. Ex. 3). Dr. Deitrick contends that after his initial diagnosis did not

appear to be correct, within seven days, he reevaluated Jones, and referred him for the appropriate

diagnostic test and to the appropriate specialist (Def. Dr. Br. 17). Given these circumstances, and

the lack of any evidence showing a refusal to treat or respond to Jones' needs, plaintiffs' claim of

deliberate indifference against Dr. Deitrick fails.

With regard to the period after April 20, 2005, when Jones was returned to the jail after his

surgery at Hackley Hospital and after his diagnosis of cancer, plaintiffs have likewise failed to

establish liability on the part of Dr. Deitrick under the standard for deliberate indifference. At the time Jones was returned to the jail, he remained under the care of Dr. Veronica Petty, the general surgeon who performed an exploratory laparotomy discovering the terminal cancer. Dr. Petty assumed care of Jones during this time and responded to the jail staff's inquiries concerning Jones' care on May 3, 2005. Jones had a scheduled appointment with Dr. Petty on May 4, 2005.

During the postoperative period when Jones was returned to the jail, Dr. Deitrick assumed oversight of his medical care on his regular weekly round of April 26, 2005 (Dr. Br. Ex. 1). Pursuant to the Hospital Discharge Summary by Dr. Petty, Dr. Deitrick was to be in charge of certain aspects of Jones' care, while follow-up would continue with Dr. Petty:

> At the time of discharge, stomal therapy follow up was arranged. He [Jones] was going to continue on his atenolol and Lasiz, spironolactone, and Vicodin as before. The medical physician at the infirmary [Dr. Deitrick] was going to be in charge of his anticoagulatin because he would need follow up for the Coumadin dosing. Follow up was to be with me in approximately 1-2 weeks. He was going to continue the heparin subcu. injections until he was therapeutic on his Coumadin. The staples were removed prior to being discharged.

(Pl. Resp. Ex. 14)

There is no evidence that Dr. Deitrick had any role in the decision to return Jones to the jail. Dr. Deitrick provided medical treatment related to Jones' hospice needs. The record indicates that Dr. Deitrick acknowledged that the jail medical staff did not have any of the recommendations from oncology, which made Jones' continued care both difficult and risky and seriously compromised the ability to care for him. However, the lack of medical records appears to be in part due to Jones' criminal defense counsel German's written demands that jail medical staff not be involved whatsoever in Jones' treatment once he was admitted to the hospital and to German's instruction to the hospital and hospital doctors that Jones' medical records not be released to the jail medical staff

(Pl. Resp. to Co. Ex. 21). Further, the record indicates that jail officials' attempts to move Jones to a nearby hospice facility were hindered by procedural obstacles in his criminal case (*See,* e.g., Def. Dr. Br. Ex. 3, Def. Dr. Reply Ex. 3).[13] In the context of Jones' overall care and treatment, Dr. Deitrick's acknowledgment of the inability to provide postoperative care for Jones does not rise to the level of conduct necessarily characterizing deliberate indifference. *See Harrison,* 539 F.3d at 517-18.

## 2. Defendant County

A local government may not be held vicariously liable under 42 U.S.C. § 1983 for an injury inflicted solely by its employees or agents. *Monell v. Dep't of Social Services,* 436 U.S. 658, 694 (1978). Liability may be imposed on a local government only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of a policy or custom of the government. *Id.*; *Blackmore,* 390 F.3d at 900. A plaintiff bringing a § 1983 claim against a county must show: (1) a policy or custom that caused the injury, and (2) "a direct causal link" between the county's policy and the alleged denial of the right to adequate medical care. *Ford v. County of Grand Traverse,* 535 F.3d 483, 495-97 (6th Cir. 2008).

Despite the circumstances surrounding Jones' illness and death, particularly between April 20 and May 5, 2005, evidence is lacking to support the County's liability under § 1983. Plaintiffs premise the County's liability on allegations of established custom at the Muskegon County Jail by which the jail employees ignore the serious medical needs of jail inmates. Plaintiffs cite three types of evidence as indicative of this "custom": (1) the complete lack of attention to Jones' medical

---

[13] This may be the most serious lapse in this case. Instead of palliative hospice care, defendant languished in a jail cell when it should have been clear that his condition was imminently terminal.

condition by everyone at the jail (guards, nursing staff and doctor); (2) there is a stated policy of the jail that prisoners are "not supposed to feel good"; and (3) the cases of four other inmates at the jail show a long-standing custom of ignoring medical needs (Pl. Resp. to Co. 19).

Plaintiffs' evidence does not logically equate to a custom. First, plaintiffs' statement that there was a *complete* lack of attention to Jones' medical needs by *everyone* is an overgeneralization, unsupported by the record, since some officers and nurses did attend to Jones' medical needs on several occasions. Further, the isolated comments made by two individual defendants, that prisoners are not supposed to feel good, is hardly reflective of the entire staff and cannot honestly be attributed to the County as a "group mentality" of deliberate indifference by jail staff. As the Supreme Court itself has recognized, "[t]he Constitution … 'does not mandate comfortable prisons.'" *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Finally, the four cases of substandard medical care alleged by other inmates do not establish a custom, particularly when considered in light of the sheer number of inmates housed over a period of several years.

Even though a custom need not receive formal approval through the body's official decisionmaking channels, it typically results from, or in, persistent and widespread practices. *See Monell,* 436 U.S. at 691. Plaintiffs' evidence falls short in both extent and degree. The circumstances cited by plaintiffs "amounts '[a]t most ... to a theory.'" *Wilson,* 501 U.S. 298 (quoting *Rhodes,* 452 U.S. at 348-49). They do not warrant a conclusion of a governmental custom of

deliberate indifference. Summary judgment is therefore properly granted in favor of defendant Muskegon County.[14]

## IV. STATE LAW CLAIMS

### A. Gross Negligence

To the extent that plaintiffs' claims of deliberate indifference fail, the claims of gross negligence likewise fail under the facts of this case. Under Michigan law, government employees are entitled to immunity for injuries caused in the course of their employment unless the employees' conduct amounted to gross negligence. The Governmental Tort Liability Act, MICH. COMP. LAWS § 691.1407(2), provides in relevant part:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency … is immune from tort liability for an injury to a person or damage to property caused by the officer [or] employee … while in the course of employment … if all of the following are met:
>
> (a) The officer [or] employee … is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, [or] employee's … conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

---

[14] Plaintiffs' complaint also suggests liability based on a failure to train theory. "'There are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983.'" *Wallace v. City of Columbus,* 2002 WL 31844688 at *5 (S.D. Ohio 2002) (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 387 (1989)). Plaintiffs have not argued a basis for this claim and thus, it will not be considered independently of plaintiffs' general claim against the County.

"'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MICH. COMP. LAWS § 691.1407(7)(a).

Defendants argue that they are entitled to immunity under Michigan law since any alleged conduct does not constitute gross negligence. Defendant Nurses assert that the standard for gross negligence is not met where there is no showing of deliberate indifference in connection with plaintiffs' § 1983 claim. *See Farmer,* 511 U.S. 825, 836 n.4; *Soles v. Ingham County*, 316 F. Supp. 2d 536, 545-46 (W.D. Mich. 2004); *but c.f. Woodhull v. County of Kent,* 2006 U.S. Dist. LEXIS 54028 at *13 n.3 (W.D. Mich. Aug. 3, 2006).

For the same reasons discussed above with respect to plaintiffs' § 1983 claims of deliberate indifference, plaintiffs' claims fail under Michigan law since there is no triable issue regarding whether defendants were grossly negligent or reckless in their treatment of Jones' medical needs.

### B. Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Lewis v. Legrow,* 670 N.W.2d 675, 689 (Mich. Ct. App. 2003). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *Graham v. Ford,* 604 N.W.2d 713, 716 (Mich. Ct. App. 1999)). The allegations against defendants do not rise to the level of extreme and outrageous conduct. To be sure, there were deficiencies in the medical care provided, but it is undisputed that some modicum of care was given to Jones in the course of his cancer, even if it fell

short of the generally accepted standard of care. The rigorous standard for the intentional infliction of emotional distress demands more than mere neglect or deficiency. Defendants are entitled to summary judgment on this claim.

## V. CONCLUSION

This case involves a tragic set of circumstances—the unexpected death of a twenty-two-year-old from colorectal cancer—even absent consideration of the flawed care system to which Jones' was subject. As nurse Yonker indicated in his deposition regarding his initial medical assessment of Jones, the expected diagnosis of a person of this age with sudden weight loss would not be cancer, but more commonly an ulcer (Pl. Resp. to Co. Ex. 12 at 20-21).

On the record before the Court, even with the benefit of hindsight, it is impossible to assign legal liability for what seems to be inadequate and/or delayed medical care provided to Jones. Blame can be legitimately considered at various levels, both within and beyond the walls of the physical jail facility: the twenty-one corrections officers? the three jail nurses? the jail doctor who makes weekly rounds? the County? financial constraints? the corrections system? the legal system? the judicial system? One thing is clear, however, this case raises serious questions about the quality of medical care for inmates at the Muskegon County Jail, the system's responsiveness to inmate medical needs, and the ability to assess and address serious medical needs … in this case, end-of-life care of a cancer patient.

In cases of this nature, there is often a wide gap between moral responsibility and legal liability. When a public system fails, we are, in part, all accountable as citizens.

Defendants' motions for summary judgment are granted (Dkts 148, 150, 168).

A Judgment consistent with this Opinion will be entered.

DATED: August 5, 2009                        /s/ Janet T. Neff
                                             JANET T. NEFF
                                             United States District Judge

VERNARD A. JONES, SR.
and MAR'TINA JONES,
Co-Personal Representatives,
Estate of Vernard A. Jones, Jr.,

        Plaintiffs,                           Case No. 1:07-cv-388

v.                                        HON. JANET T. NEFF

MUSKEGON COUNTY, et al.,

        Defendants.

_____/

## <u>JUDGMENT</u>

In accordance with the Opinion entered this date:

**IT IS HEREBY ORDERED** that defendants' motion for Joinder of Defendants County of Muskegon, Warner Watson, et al., in Co-defendants' Mastee, Malenko & Yonker's Motion to Strike Portions of Affidavits (Dkt 164) is GRANTED.

**IT IS FURTHER ORDERED** that Motion of Defendants Mastee, Malenko and Yonker to Strike Portions of Affidavits (Dkt 162) is DENIED.

**IT IS FURTHER ORDERED** that plaintiffs' Motion to Strike Exhibit of Reply Brief of Muskegon County and Correctional Officers (Dkt 172) is DENIED.

**IT IS FURTHER ORDERED** that Defendants' Muskegon County and Correctional Officers Motion for Summary Judgment (Dkt 148) is GRANTED.

**IT IS FURTHER ORDERED** that Defendants Nancy Mastee, Sherry Malenko and William Yonker Motion for Summary Judgment (Dkt 168) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant's, David Deitrick M.D., Only, Motion for Summary Judgment Pursuant to Federal Rule Civil Procedure 56 (Dkt 150) is GRANTED.

**IT IS FURTHER ORDERED** that this Judgment resolves the last pending claim and the action is TERMINATED.


DATED: August 5, 2009                    /s/ Janet T. Neff                              
                                         JANET T. NEFF
                                         United States District Judge